# NORFOLK SOUTHERN RAILROAD COMPANY *v.* CHATMAN.

## ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 192. Argued April 20, 1917.—Decided May 21, 1917.

Under the doctrine established by *Railroad Company* v. *Lockwood*, 17 Wall. 357, and many cases decided since, a person traveling by railroad as a caretaker of live stock on a "free" or "drover's" pass is a passenger for hire as to whom a stipulation that the carrier shall not be liable for personal injuries caused by its negligence is void.

As applied to caretakers of live stock, § 1 of the Hepburn Act of June 29, 1906, uses the term "free pass" in the sense which established custom had given it and judicial determination had sanctioned long before the act, viz., as meaning not a gratuitous pass but one issued for a consideration constituting the caretaker a passenger for hire, within the doctrine of the *Lockwood Case*. *Charleston & Western Carolina Ry. Co.* v. *Thompson*, 234 U. S. 576, distinguished.

Where a connecting carrier, sued for personal injuries by a person traveling on a drover's pass, based its defense on a release of liability for negligence contained in the contract of carriage issued by, and in accordance with the tariffs of, the initial carrier, under the Carmack Amendment, *Held* that it was estopped from claiming also that under its own tariff the issuance of such passes was forbidden and unlawful and that therefore such traveler was unlawfully upon its train.

A provision in a tariff that "free or reduced transportation shall not be issued for shippers or caretakers in charge of live stock shipments, . . . and such shippers or caretakers shall pay full fare *returning*," is construed as implying that such transportation will be allowed to the destination of the shipment, but not for the return trip of the caretaker.

When connecting interstate carriers, in accordance with tariffs of the initial carrier duly filed and published, contract to carry a shipment of live stock with a caretaker for a specified rate in money, the carriage *quoad* the caretaker is a carriage for money, part of the total rate, and the mere fact that the part attributable to the caretaker is

not stated separately in a passenger tariff does not render the contract to carry him invalid under the Act to Regulate Commerce.

Separation of the rate in such a case is an administrative matter affecting the form of tariffs, which is committed to the Interstate Commerce Commission by § 6 of the Commerce Act, as amended, and concerning which the courts will not interfere in advance of application to the Commission.

222 Fed. Rep. 802, affirmed.

THE case is stated in the opinion.

*Mr. C. M. Bain* (by special leave), with whom *Mr. John H. Small, Mr. W. B. Rodman* and *Mr. J. Kenyon Wilson* were on the briefs, for plaintiff in error.

*Mr. Charles Whedbee* and *Mr. P. W. McMullan* for defendant in error.

MR. JUSTICE CLARKE delivered the opinion of the court.

The judgment obtained in this case by the plaintiff in the District Court, W. C. Chatman, affirmed by the Circuit Court of Appeals for the Fourth Circuit, is here for review on writ of error.

On December 1, 1911, the plaintiff below (hereinafter designated as the plaintiff) delivered to the Pennsylvania Railroad Company at Jersey City a carload of horses to be carried to Hertford, N. C., and was tendered by an agent of the company for his signature, the customary "Uniform Live Stock Contract" of the Pennsylvania Company, the essential provisions of which are printed in the margin.[1]

---

[1] The provisions of the contract essential to be considered are, in substance, that the company had received from Chatman a carload of horses for transportation to Port Norfolk for Hertford, N. C., "with W. C. Chatman in charge;'" and that it was received by the Pennsylvania Company "for itself and on behalf of connecting carriers for

This contract was retained by the company but from it was detached a "coupon" which was given to Chatman, containing, in substance, an acknowledgment that he had delivered live stock of the kind and nature therein described, consigned to W. C. Chatman, destination Port Norfolk, Va., for Hertford, N. C., "W. C. Chatman, man

---

transportation, subject to the official tariffs, classifications and rules of the said company"; and "that the said shipper is at his own sole risk and expense to load and take care of and feed and water said stock whilst being transported . . . and neither said carrier nor any connecting carrier is to be under any liability or duty with reference thereto, except in the actual transportation of the same . . . That the shipper shall see that all doors and openings in said car or cars are at all times so closed and fastened as to prevent the escape therefrom of any of the said stock." It further provided that in consideration of the premises and of the carriage of a person or persons in charge of said stock upon a freight train of said carrier or its connecting carriers without charge, other than the sum paid or to be paid for the transportation of the live stock in his or her charge, that the said shipper shall and will indemnify and save harmless said carrier and every connecting carrier from all claims and liabilities of every kind, by reason of personal injury sustained by the person in charge of said stock, whether the same be caused by the negligence of said carrier or any connecting carrier, or otherwise.

There was printed upon this contract, as a part of it, the following:

"RELEASE FOR MAN OR MEN IN CHARGE.

"In consideration of the carriage of the undersigned upon a freight train of the carrier or carriers named in the within contract without charge, other than the sum paid or to be paid for the carriage upon said freight train of the livestock mentioned in said contract, of which livestock . . . in charge, the undersigned does hereby voluntarily assume all risks of accidents or damage to his person or property, and does hereby release and discharge the said carrier or carriers from every and all claims, liabilities and demands of every kind, nature and description for or on account of any personal injury or damage of any kind sustained by the undersigned so in charge of said stock, whether the same be caused by the negligence of the said carrier or carriers or any of its or their employees or otherwise.

(signature of man in charge)
W. C. CHATMAN."

in charge." Without other pass or ticket than this "coupon" and without other payment than the published tariff on the carload of stock, the Pennsylvania Railroad Company carried the plaintiff, with his carload of horses, on a freight train to Norfolk, Virginia, where the car was delivered to and accepted by the defendant company for transportation to its destination.

The plaintiff testifies that defendant's conductor saw him and knew he was on the car up to the time the accident complained of occurred.

The car in which the horses and the plaintiff were being carried was derailed on defendant's line, and the plaintiff, being injured, sued for damages and secured the judgment which we have before us.

The negligence of the defendant is not disputed.

On this record the defendant claims two defenses, the first of which is:

That the plaintiff is not entitled to recover, because, when injured, he was traveling on a free pass issued pursuant to the terms of the live stock contract in which he had released the carriers from all liability for any personal injury which he might sustain, thus bringing his claim within the authority of *Northern Pacific Ry. Co.* v. *Adams*, 192 U. S. 440.

In *Railroad Company* v. *Lockwood*, 17 Wall. 357, 384, it was decided that a person traveling on a "drover's pass," issued upon a live stock contract precisely similar in its terms to that which we have in this case, was a passenger for hire and that a release from liability for injuries caused by the carrier's negligence was void because a common carrier could not lawfully stipulate for such exemption.

This decision was rendered in 1873, and has been frequently approved: *Railway Company* v. *Stevens*, 95 U. S. 655; *Liverpool & Great Western Steam Co.* v. *Phenix Insurance Co.*, 129 U. S. 397; *Baltimore & Ohio Southwestern*

*Ry. Co.* v. *Voigt*, 176 U. S. 498, 505; *Santa Fe, Prescott & Phœnix Ry. Co.* v. *Grant Brothers Construction Co.*, 228 U. S. 177, 184; *Pierce Co.* v. *Wells, Fargo & Co.*, 236 U. S. 278, 283. This court continues of the opinion expressed by it in 1900, in *Baltimore & Ohio Southwestern Ry. Co.* v. *Voigt, supra*, that the *Lockwood Case* must "be regarded as establishing a settled rule of policy."

But the plaintiff in error claims that this rule is no longer applicable to such a case as this we are considering, for the reason that, while the plaintiff as the shipper of the stock was within the exception of § 1 of the amendment to the act "to regulate commerce" of June 29, 1906, 34 Stat. 584, prohibiting the issuance of any "interstate . . . free pass . . . except . . . to necessary care takers of live stock, poultry and fruit" yet this exception permitted him to travel free of charge upon a "free pass or free transportation," and not as a passenger for hire on a free pass, which would be a contradiction in terms.

The *Lockwood Case* shows that live stock contracts such as we have here, providing for the transportation of caretakers of stock on free passes, were in use by carriers as early as 1859 (17 Wall. 357, 365), and that they have continued in use up to this time is apparent from the decisions hereinbefore cited, from the case at bar and from many recently reported cases. *Tripp* v. *Michigan Central R. R. Co.*, 238 Fed. Rep. 449. Notwithstanding the fact, as we have seen, that such transportation has been declared by a long line of decisions not to be "free" in the popular sense, but to be transportation for hire, with all of the legal incidents of paid transportation, the carriers of the country have continued to issue it and to designate it as "free."

With this legal and commercial history before us we must conclude that the designation "free pass," as applied to transportation issued or given by railroad companies to

shippers and caretakers of stock, had acquired a definite and well known meaning, sanctioned by the decisions of this court and widely by the decisions of the courts of the various States, long prior to the enactment of June 29, 1906, and that, therefore, Congress must be presumed to have used the designation "free pass" in the sense given to it by this judicial determination when, in § 1 of that act, by specific exception, it permitted the continuance of the then long established custom of issuing free transportation or passes to shippers or caretakers of live stock. *Kepner* v. *United States*, 195 U. S. 100; *Lawder* v. *Stone*, 187 U. S. 281, 293; Sutherland on Statutory Construction, § 333.

It results that the "settled rule of policy" established by the *Lockwood Case*, and the decisions following it, must be considered unmodified by the Act to Regulate Commerce, that the plaintiff in charge of his stock, traveling upon a pass permitted to be issued by that act, was a passenger for hire, and that defendant's first claim must therefore be denied.

The claim of the defendant that the plaintiff was unlawfully upon its train because its published tariff did not allow the issuing of such a pass as that which the plaintiff was using when injured is without merit.

The extract from the defendant's tariff relied upon to sustain this claim reads:

"Free or reduced transportation shall not be issued for shippers or caretakers in charge of live stock shipments, whether carloads or less, and such shippers or caretakers shall pay full fare *returning*."

It is sufficient answer to this claim to say that the railroad company is here defending under the release from liability contained in a contract of carriage, issued as required by law (§ 7 of the Act of June 29, 1906, 34 Stat. 595), pursuant to the published tariffs of its connecting, the initial carrier, the Pennsylvania Railroad Company,

and it will not be heard in the courts to urge the inconsistent defense that its own tariff made unlawful this contract on which in the alternative it relies.

To this we add that passes for caretakers, not only to destination but returning to point of shipment, were formerly general (*Cleveland, Painesville &c. R. R. Co.* v. *Curran*, 19 Ohio St. 1), and in some parts of the country are still issued (*Kirkendall* v. *Union Pacific R. R. Co.*, 200 Fed. Rep. 197, 200), and that, in our opinion, the language of the notice quoted, while obscurely worded, implies that such passes will be issued by the defendant to destination of the shipment and was intended as notice to shippers that return passes would not be allowed. The meaning now claimed for this notice would have been unmistakably expressed without the final clause "and such shippers or caretakers shall pay full fare *returning*." Why "returning" if full fare were also to be paid "going"? Tariffs must not be made cunningly devised nets in which to entangle unsuspicious or inexperienced shippers.

The second defense of the railroad company is in the alternative, and must be considered because its first defense has failed.

This claim is that under the Interstate Commerce Law payment for the transportation of passengers for hire could be made only in money, and at a rate stated in a tariff filed and published in the manner required by law; that no separate payment for plaintiff's transportation was made in money, and the consideration for it must be found, if at all, incorporated in the rate charged for the stock or in the service which he was to render in caring for it in transit, and that, as neither of these was separately stated in any filed and published tariff the plaintiff's presence upon the car was unlawful and he should not recover for injuries sustained.

In the consideration of this second claim of the defend-

ant these facts appearing of record are decisive: The defendant relies for its defense upon the terms of the live stock contract entered into between its connecting carrier the Pennsylvania Company and the plaintiff and, averring in its answer that it received the shipment of horses "in accordance with the terms of the said contract," it claims immunity from liability for damages to the plaintiff under the declaration of that contract, that: "In consideration of the carriage of the undersigned [plaintiff] upon a freight train of the carrier or carriers named in the within contract without charge, other than the sum paid or to be paid for the carriage . . . of the live stock" the plaintiff assumed the risk of accident and released said carrier or carriers from all liability to him for any injury which he might sustain.

While the record is not as clear as could be wished the excerpts which it contains from the filed tariffs of the Pennsylvania Company and the live stock contract, both introduced in evidence by the defendant, justify the conclusion, certainly as against the defendant, that the contract was a part of the tariffs of the Pennsylvania Company filed and published according to law and that the defendant is bound by its terms.

Treating this live stock contract as a part of the lawfully published tariffs of the Pennsylvania Company, under which the contract for the carriage of the plaintiff was made, and by which the defendant confesses itself bound, it is clear that such tariffs show the two carriers declaring that for the published rate payable in money the plaintiff's carload of stock and the plaintiff himself, as a caretaker, would be carried on freight trains from Jersey City to the North Carolina destination, and as we have seen the law declares that a caretaker so carried is a passenger for hire against whom the release of liability on which the defendant relies must be treated as unreasonable and void.

The objection that the published tariff of the Pennsylvania Company did not specify how much of the stipulated payment by the plaintiff should be treated as payment for the transportation of the stock and how much for the transportation of the caretaker, and that the payment for the carriage of the plaintiff was not separately stated in a passenger tariff, cannot be considered in this case for the reason that the Act to Regulate Commerce (§ 6, as amended June 29, 1906, June 18, 1910, and August 24, 1912) commits to the Interstate Commerce Commission the determining and prescribing of the form in which tariff schedules shall be prepared and arranged, and this is an obviously administrative function with which the courts will not interfere in advance of a prior application to the Interstate Commerce Commission. *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States*, 232 U. S. 199, 221; *Texas & Pacific Ry. Co.* v. *American Tie & Timber Co.*, 234 U. S. 138.

It results that the second claim of the defendant must be rejected because the fare of the plaintiff was paid in money pursuant to published tariffs, which clearly showed the terms of the shipment of the stock with transportation for the plaintiff included, in a form which in the state of this record must be considered as having been satisfactory to the Interstate Commerce Commission, to which the determination of such form was committed by law.

The claim that *Charleston & Western Carolina Ry. Co.* v. *Thompson*, 234 U. S. 576, rules this case cannot be allowed, for the sufficient reason that the plaintiff in that case was found to be traveling upon a gratuitous pass, issued without consideration to a member of the family of an employee. Behind such a pass there lay no such background of court decision and of railroad practice as we have here, giving definite interpretation to the statute as applied to "caretakers' passes" and therefore that case fell without the scope of the *Lockwood* decision and within

the principle of *Northern Pacific Ry. Co.* v. *Adams,* 192 U. S. 440, and *Boering* v. *Chesapeake Beach Ry. Co.*, 193 U. S. 442.

The judgment of the Circuit Court of Appeals is

*Affirmed.*